UNITED STATES DISTRICT COURT
DISTRICT OF DELAWARE

```
-------------------------------------------------------X
ENERGY MARINE SERVICES INC.,         :        Civil Case No.
                                     :
             Plaintiff,              :
                                     :        ADMIRALTY
      vs                             :
                                     :
DB MOBILITY LOGISTICS AG, and        :
SCHENKER LIBYA FOR                   :
TRANSPORT SERVICE COMPANY,           :
                                     :
             Defendants.             :
------------------------------------------------- X
```

**VERIFIED COMPLAINT WITH PRAYER FOR PROCESS
OF MARITIME ATTACHENT AND GARNISHMENT**

Plaintiff ENERGY MARINE SERVICES INC. ("ENERGY MARINE" or "Plaintiff") submits this Verified Complaint against DB MOBILITY LOGISTICS AG ("DBMLAG") and SCHENKER LIBYA FOR TRANSPORT SERVICE COMPANY ("SCHENKER LIBYA")—each a foreign corporation and hereinafter collectively referred to as "Defendants"—and for its claim avers and pleads as follows.

**PARTIES, JURISDICTION, AND VENUE**

1.     This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure and falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. § 1333.  Plaintiff brings this action to obtain security for a maritime claim, in maritime arbitration proceedings in London, pursuant to Rule B of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Rule B"); and seeks an order and writ of attachment over property of Defendant DBMLAG, including but not limited to the shares of stock owned by the

1

Defendant in the said Defendant's wholly owned subsidiaries DB US Corporation ("DB US") and DB US Holding Corporation ("DB US HOLDING")—hereinafter collectively referred to as "Garnishees"—and any credits or effects of Defendants in the hands of the said Garnishees, including but not limited to accounts, debts, dividends, contractual rights, and any intangible property whatsoever of any Defendant in the hands of the Garnishees up to the amount claimed hereunder.

2.      At all times material hereto, Plaintiff is and was a business entity organized under the laws of the Republic of the Marshall Islands, and was the registered owner of the oceangoing tugboat AHTS "SEABULK TOUCAN," which is registered in the Republic of the Marshall Islands.

3.      At all times material hereto, Defendant DBMLAG is and was a foreign company organized and operating under the laws of Germany, with its principal place of business at Potsdamer Platz 2, 10785 Berlin, Germany.

4.      At all times material hereto, Defendant SCHENKER LIBYA was a business organization organized and existing under the laws of a country other than the United States.

5.      This court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1333 because this action arises from a maritime contract, *i.e.,* a time charter party in respect of earned time charter hire, which is due and owing and which Defendants have failed to pay.

## THE DEFENDANTS' CORPORATE IDENTITY

6.      At all times material hereto, DBMLAG was the controlling parent company of SCHENKER LIBYA through which DBMLAG carried on business in Libya in the area of oilfield logistics support services.

7.      At all times material hereto, DBMLAG carried on its Libyan business through SCHENKER LIBYA using personnel employed by various subsidiaries that were part of its worldwide logistics network situated in a number of countries including a subsidiary in France - Schenker S.A. in Marseille; and Schenker Mauritania, in addition to personnel resident and employed in Libya. *See* declaration of Mr. John Benzonana hereto attached, and henceforth identified as "*BENZONANA*", at ¶¶ 18-20 and EXHIBITS 7, 13, 14, 15, 16, 17, 18 and 19 thereto.

8.      At all times material hereto, DBMLAG in carrying on its Libyan business through SCHENKER LIBYA employed the departments of its subsidiaries situated in countries other than Libya which functioned as if they were departments integrated with SCHENKER LIBYA. *Id.*

9.      At all times material hereto, SCHENKER LIBYA in carrying on business held itself out as "DB SCHENKER," a name which it used in its official business stamp, its stationery, its correspondence, and its business forms.  *Id.* at ¶¶ 3, 9, 10, 11, 16 and at EXHIBITS 3, 9, 10, and 11.

10.      At all times material hereto, the name "DB SCHENKER" was used by SCHENKER LIBYA in its trademark format, *i.e.* with the letters "DB" in black color inscribed within a red square.  *Id.* at ¶12 and EXHIBITS 4-5.

11.    At all times material hereto, the trademark "DB SCHENKER" was and remains registered with the U.S. Patent and Trade Mark Office and is owned by Deutsche Bahn AG, the parent company of Defendant DBMLAG.  *Id.* at EXHIBIT 3.

12.    At all times material hereto, the trademark "DB SCHENKER" is registered with the European Union data base of Office of Harmonization of the Internal Market ("OHIM") and is owned by Deutsche Bahn AG, the parent company and 100% owner of the stock of Defendant DBMLAG.  *Id.* at EXHIBIT 5.

13.    At all times material hereto, the registered trade mark "DB SCHENKER" is the brand under which the Deutsche Bahn Group of companies carries on business in the transport and logistics fields worldwide under the corporate control of Defendant DBMLAG.  *Id.* at EXHIBIT 27.

14.    At all time material hereto, with effect from June 2, 2008, it was resolved by the management of the Deutsche Bahn Group to hive off the passenger transport and logistics sectors to form the company DB Mobility Logistics AG (DB ML AG), of which a maximum share of 24.9% was to be privatized.  *Id.* at EXHIBIT 27.

15.    At all times material hereto, DBMLAG held out SCHENKER LIBYA to be part of its own worldwide logistics business operations with its solvency backed up by the financial resources of DBMLAG's worldwide logistics organization.  *Id.* at ¶¶ 24-26 and EXHIBITS 21-23.

16.    At all times material hereto, all major decisions relating to the business carried on by SCHENKER LIBYA with the Plaintiff were made by executives of subsidiaries of the DBMLAG group who were neither officers nor directors nor even

employees of SCHENKER LIBYA.  *Id.* at ¶¶ 18-20, 22 and EXHIBITS 7, 13, 14, and 16-20.

17.     At all times material hereto, SCHENKER LIBYA represented to Plaintiff that matters relating to the performance of its contract with Plaintiff were controlled by the group's corporate management who had delegated their handling to the manager of the Marseilles branch of Schenker, S.A. of France. *Id. at* ¶ 22 and EXHIBIT 20.

18.     All times material hereto, the finances of SCHENKER LIBYA were under the control of  Schenker's Africa region financial director who was employed at DB Schenker's Marseilles branch office in France.  *Id.* at ¶ 20 and EXHIBITS 7, 18, 19.

19.     At all times material hereto, DBMLAG issued consolidated annual reports which listed its revenue from the operations of SCHENKER LIBYA as its own revenue. *Id.* at ¶ 26 and EXHIBIT 26.

20.     At all times material hereto, the internet domain used by SCHENKER LIBYA in electronic mail correspondence, *i.e.* "dbschenker.ly," is owned and was registered by "Deutsche Bahn AG of Potsdamer Platz Berlin Germany Zip/Postal code: 10785," the parent company of Defendant DBMLAG.  *Id. at* ¶ 15, EXHIBIT 8.

21.     Toward the end of 2010, when SCHENKER LIBYA had become unprofitable, DBMLAG "sold it" to Libyan interests together with all of its assets and property, excluding, however, the corporate name "Schenker" and the registered trademark logotype , DB SCHENKER.  *Id.* at ¶ 25 and EXHIBIT 24.

## THE SUBSTANTIVE CLAIM

22.     On or about June 16, 2008, ENERGY MARINE following negotiations through its marine managers Seacor Worldwide, Inc. for the chartering of its AHTS

vessel SEABULK TOUCAN (hereinafter also "the vessel") fixed its vessel on a time charter party to SCHENKER LIBYA.  *Id.* at ¶ 10 and EXHIBIT 2 thereto.

23.    In due course a formal charter party document in an amended "Bimco Supplytime" form was signed by both parties, evidencing their contract.  On behalf of the charterer the charter was signed by Mr. Karim Azaiz who was the General Manager of Schenker - Mauritania, a branch of the logistics business of Defendant DBMLAG in the African country of Mauritania, and was sealed with the corporate rubber stamp of SCHENKER LIBYA which incorporated the registered trademark "DB SCHENKER" the brand under which the Deutsche Bahn Group of companies carries on business in the transport and logistics fields worldwide. *Id.* at ¶ 11 and EXHIBIT 3 at pg. 2.

24.    The vessel was duly delivered to SCHENKER LIBYA on or about July 26, 2008, and on or about March 28, 2009, she was redelivered to ENERGY MARINE. However, at the time of her redelivery there was a substantial amount of charter hire that SCHENKER LIBYA had withheld and was refusing to pay, and an additional amount for a maintenance allowance payable under the charter party.

25.    The dispute related to the refusal of SCHENKER LIBYA to accept delivery of the vessel into the time charter as of July 26, 2008 by reason of an alleged damage to one of its propeller blades, while at the same time requiring the vessel to stand by and perform work under the charter and refusing her owners' request to sail to drydock to have the damage repaired.

26.    Following redelivery, negotiations were carried out between ENERGY MARINE and the branch manager of Schenker's Marseille, France, branch who,

according to SCHENKER LIBYA, had been authorized by Schenker's corporate management to handle the dispute.  *Id*. at ¶ 22 and EXHIBIT 20.

27.     The negotiations failed to produce a mutually acceptable compromise, and the parties submitted their differences to arbitration in London wherein ENERGY MARINE filed its claim submission on June 6, 2010, in accordance with the provisions of charter party clause 34, with each party having appointed its arbitrator and the two arbitrators so chosen appointing a third.

28.     In the course of the arbitration, both parties applied to the arbitration tribunal to order their opposing party to provide security for costs.  In response to ENERGY MARINE's application, SCHENKER LIBYA through its solicitors argued that though it was justifiable to order ENERGY MARINE to provide security, as it was a one-ship company, but that there was "no similar justification for Owners' having security from Charterers for Owners' costs of arbitration", as the "Charterers [SCHENKER LIBYA] are part of a very large multinational business operation (see attached pages from www.dbschenker.com)." *Id*. at ¶ 24 and EXHIBIT 21.

29.     The website to which SCHENKER LIBYA referred in order to support its assertion that it was part of a very large multinational business was the website of "DB Schenker - Transportation and Logistics in the DB Group -Africa".  *Id. a*t ¶ 21, and EXHIBIT 22.

30.     SCHENKER LIBYA made this representation to the arbitration tribunal not once, but twice when it reasserted in its correspondence with the tribunal that SCHENKER LIBYA was "... part of a large and well known international group of

companies, and there appears no prospect of a costs award in Owners' favour going unpaid should such an award ultimately be made." *Id.* at ¶ 26 and EXHIBIT 23.

31.     Though ENERGY MARINE was ready, willing, and able to provide security for costs, as the tribunal ultimately ordered both parties to do, the solicitors who represented SCHENKER LIBYA advised the tribunal on or about June 27, 2011 that they could not obtain instructions from their clients, and were unable to obtain instructions from other companies in the Schenker group as "the Schenker group disposed of its interest in Charterers at the end of 2010." *Id.* at ¶ 28 and EXHIBIT 24.

32.     In follow-up correspondence exchanged with Schenker AG, the transport and Logistics Division of Deutsche Bahn and a principal member of the DBMLAG group, it admitted that "the former Schenker Libya for Transport and Services Company" had been sold to "other shareholders." *Id.* at ¶ 29 and EXHIBIT 25.  However, Schenker AG was unwilling and failed to identify the buyer of the shares, the number of shares sold, the date on which the shares were sold, and other relevant information.  Moreover, it failed to identify the legal process or transaction(s) whereby SCHENKER LIBYA became "the former Schenker Libya for Transport and Services Company" (emphases added).

33.     As a result of: the sale of the assets of SCHENKER LIBYA to new shareholders, the divestiture of DBMLAG in same, the disaffiliation of SCHENKER LIBYA from "the very large multinational business operation" of which it was represented to be a part, what has come about was the virtual liquidation of SCHENKER LIBYA and a complete change of its identity, so that the respondent before the arbitration tribunal is no longer SCHENKER LIBYA, but a complete sham.

34.     Plaintiff claims in the London maritime arbitration damages for unlawfully and impermissibly withholding time charter hire in the amount of U.S. $611,250 together with interest the amount of which to date, at the rate of 6% compounded at quarterly intervals, is estimated to be U.S. $388,604 from the time it was due and payable to the projected date of the award *i.e.* December 31, 2016; and unpaid maintenance/dry-docking allowance under charter party clause 13(c) for the period July 26, 2008 through March 28, 2009 in the amount of U.S. $160,000 together with interest at the rate of 6% compounded at quarterly intervals which is estimated to amount to U.S. $101,719.

35.     It is customary for London maritime arbitrators to award to the prevailing party in addition to interest, legal fees, arbitrators' fees, rental of the arbitration premises, and costs for the attendance of witnesses, which Plaintiff estimates will be no less than U.S. $250,000.

36.     Based on the foregoing, Plaintiff's claim in arbitration is estimated to be **U.S. $1,511,573** (One Million, Five Hundred Eleven Thousand, Five Hundred Seventy-Three Dollars).

## APPLICATION FOR ATTACHMENT UNDER
## SUPPLEMENTAL ADMIRALTY RULE B

37.     Defendants SCHENKER LIBYA and DBMLAG are not present and cannot be found in the District within the meaning of Rule B of the Supplemental Rules for Admiralty or Maritime Law Claims and Asset Forfeiture Actions. *See Attorney Declaration of George A. Gaitas attached hereto as* **GAITAS DECLARATION.** But upon information and belief, the Defendant DBMLAG has within the District tangible or intangible personal property in the hands of parties, present in the forum, who may be

named garnishee in the process of maritime attachment and garnishment, said property consisting of debts, credits, or effects that may include, without limitation, stocks, corporate shares, loan repayments, accounts payable, dividends payable, and payments held or which may be receivable by and/or payable to the said garnishee on behalf and/or for the benefit of the said Defendants.

38.     More particularly, Defendant's DBMLAG's subsidiaries and debtors DB US Corporation ("DB US") and DB US Holding Corporation ("DB US HOLDING") each are incorporated in this state, are Delaware Corporations, and have as their registered agent The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801. *BENZONANA* at ¶ 33 and EXHIBITS 6 and 28.

39.     According to a corporate disclosure statement filed in other judicial proceedings, DB US Holding Corporation is a wholly-owned subsidiary of DB US Corporation, formerly known as Stinnes Holding Corporation, Tarrytown, NY; and DB US Corporation is a wholly-owned subsidiary of DB Mobility Logistics, AG. *Id.*

40.     By virtue of its status as shareholder of DB US Holding Corporation and DB US Corporation, Defendant DBMLAG should be entitled to receive its proportionate share of dividends declared by these two wholly-owned subsidiaries.

41.     At all times material hereto, Defendants DBMLAG and SCHENKER LIBYA expressly represented SCHENKER LIBYA to be a branch and part of the Schenker Logistics Group, carrying on business under the "DB SCHENKER" brand, and having the economic backing and support of the said business organization.

42.     At all times material hereto, Defendant DBMLAG abused the corporate form of SCHENKER LIBYA through which it had engaged in business for profit by transferring all of the assets and corporate control over SCHENKER LIBYA to third

parties, and by entering into arrangements whereby the corporate name "SCHENKER LIBYA" and the "DB SCHENKER" brand would no longer identify the entity with which Plaintiff had contracted, and without making any arrangements for the eventual payment of Plaintiff's claims in London arbitration, in the event that Plaintiff ENERGY MARINE prevails.

43.    As a result of these actions of DBMLAG, SCHENKER LIBYA was stripped of its assets and ceased to exist as a viable corporate entity, while its controlling shareholder DBMLAG received and appropriated to itself the proceeds of the sale of the company.

44.    At all times material hereto SCHENKER LIBYA was a branch and a department of the greater international logistics business carried on by its parent company DBMLAG under the brand name DB SCHENKER, as evidenced by the following:

   a)   SCHENKER LIBYA engaged in business under the trade name and brand DB SCHENKER, the brand of the international logistics business of Defendant DBMLAG;

   b)   In carrying on business with Plaintiff ENERGY MARINE, defendants SCHENKER LIBYA and DBMLAG acted by and through corporate departments and personnel which belonged to other corporate business entities of the DBMLAG group situated in several countries including France and Mauritania;

   c)   DBMLAG entirely dominated SCHENKER LIBYA, treating its assets and even its corporate name as its own property; selling off its assets to third

11

parties, and discontinuing the use of the corporate name "Schenker Libya," effectively putting SCHENKER LIBYA out of business;

d) DBMLAG filed consolidated financial statements with SCHENKER LIBYA contained in DBMLAG's annual reports;

e) All major decisions on behalf of SCHENKER LIBYA, including its liquidation and cessation of carrying on business in its own corporate name, were made by persons who were either in the employ of DBMLAG or other corporate entities affiliated with or controlled by DBMLAG and were acting as the de facto officers and directors of SCHENKER LIBYA.

f) DBMLAG, as the controlling shareholder, not only failed to adequately capitalize SCHENKER LIBYA, so that it would be capable of responding to its obligations to creditors, but also withdrew its capital investment at a time critical for its subsidiary's economic survival.

45.     In consequence of the facts pled in paragraphs 6-21, 23, 26, 28-33, and 42-44 of this Verified Complaint, and the allegations of fact in the attached declaration of Mr. John J. Benzonana, Plaintiff has made a prima facie showing that SCHENKER LIBYA was at all times material hereto a corporate alter ego of Defendant DBMLAG; and it was and continues to be used abusively by DBMLAG to commit wrongdoing to the detriment of Plaintiff ENERGY MARINE, *i.e.* to evade, thwart and frustrate Plaintiff's recovery of an arbitration award and ability to enforce the underlying maritime claim.  It is therefore appropriate for this Honorable Court in granting the relief prayed for hereunder, in order to protect its jurisdiction over this admiralty and maritime claim[1] to order the property of DBMLAG found in the district to be attached pursuant to and for

---

[1] *Swift & Co. Packers v. Compania Colombiana Del Caribe, S. A.*, 339 U.S. 684, 694-695 (1950).

the reasons contained in the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.

46.     Plaintiff has maritime claims against the Defendants arising out of a maritime contract, *i.e.* a time charter party, as pled in the foregoing.

47.     The amount of Plaintiff's claim as reasonably as it can be estimated is as follows:

A.     Unpaid charter hire due and owing …………..………. $611, 250

B.     Interest (at the rate of 6%) on the outstanding
        amount of unpaid  hire compounded quarterly  ….….$388, 604

C.     Maintenance / dry-docking allowance ……...………. $160,000

D.     Interest on the unpaid maintenance /
        dry-docking allowance ……………………………. $101,719

E.     Legal fees and arbitration costs ……………….……... $250,000
                                                              --------------
TOTAL                                         $1,511,573

48.     Therefore, Plaintiff's total claim for breach of the maritime contract against Defendants is in the aggregate sum of **$1,511,573**.

**WHEREFORE, PREMISES CONSIDERED**, Plaintiff prays as follows:

A.     That process in due form of law, according to the practice of this Honorable Court in matters of admiralty and maritime jurisdiction, be issued against Defendant DBMLAG and said Defendant be cited to appear and answer the allegations of this Complaint;

B.     That if Defendant cannot be found within this district, then all of its personal property, both tangible and intangible, in the hands of garnishees served in this district, consisting of debts, credits, or effects, including but not limited, to corporate

stock and/or shares Defendant holds in any corporate entities named garnishees in the Process of Maritime Attachment and Garnishment; and also any debts, whether or not same have matured, owing to the said Defendant by such garnishees; and any accounts, checks, payments, transfers, and any other tangible or intangible property whatsoever of which Defendant is beneficiary, in the hands of garnishees named in the Process of Maritime Attachment and Garnishment, be attached and seized pursuant to Supplemental Admiralty Rule B for Certain Admiralty and Maritime Claims.

        C.      That a judgment be entered against the Defendant in the sum of **U.S. $1,511,573** and the proceeds of the assets attached be applied in satisfaction thereof;

        D.      That the Court grant such other and further relief as it deems, just, equitable and proper.

Respectfully submitted,

PALMER BIEZUP & HENDERSON LLP

/s/ Michael B. McCauley
Michael B. McCauley (ID 2416)
1223 Foulk Road
Wilmington, DE 19803
Tel: (302) 594-0895
Fax: (302) 478-7625
Email: mccauley@pbh.com
*Attorneys for Plaintiff*
ENERGY MARINE SERVICES INC.

*Of counsel:*

CHALOS & CO, P.C.
George A. Gaitas
(*pro hac vice application forthcoming*)
7210 Tickner Street
Houston, Texas 77055
Telephone: 713-936-2427
Facsimile: 713-782-5274