**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| ENERGY MARINE SERVICES INC. | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 15-24-GMS |
| | ) | |
| DB MOBILITY LOGISTICS AG, | ) | **ADMIRALTY** |
| SCHENKER LIBYA FOR TRANSPORT | ) | |
| SERVICE COMPANY, and | ) | |
| SCHENKER S.A., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT DB MOBILITY LOGISTICS AG'S
MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS
THE CLAIMS OF ENERGY MARINE SERVICES INC.
FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF MAY BE GRANTED**

YOUNG CONAWAY STARGATT
& TAYLOR, LLP
James M. Lennon (No. 4570)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-5009
jlennon@ycst.com

*Of Counsel:*

HOLLAND & KNIGHT LLP
Michael J. Frevola (pro hac vice
application forthcoming)
F. Robert Denig (pro hac vice
application forthcoming)
31 West 52nd Street
New York, New York 10019
Tel: (212) 513-3200
Email: michael.frevola@hklaw.com

*Attorneys for Defendant
DB Mobility Logistics AG*

March 9, 2015

# TABLE OF CONTENTS

**Page**

I. STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS ................................... 1

II. SUMMARY OF ARGUMENT ............................................................................................... 1

III. STATEMENT OF FACTS ................................................................................................... 2

    **A. Background** .................................................................................................................... 2

    **B. DBML's Indirect Shareholder Interest in Schenker Libya** ............................................. 3

ARGUMENT ................................................................................................................................ 5

I. EMS' AMENDED COMPLAINT FAILS TO ALLEGE FACTS  WHICH, IF PROVEN,
PLAUSIBLY WOULD GIVE PLAINTIFF A  RIGHT TO RELIEF ........................................... 6

    **A. Third Circuit Precedent Requires Fraudulent Intent** ...................................................... 6

    **B. Other Circuits' Precedent** .............................................................................................. 7

    **C. EMS' Complaint Fails To Satisfy Either Test** ................................................................. 8

        1. Allegations Either not Involving DBML or Not Alleging DBML's Domination  and
        Control of Schenker Libya ............................................................................................. 9

        2. Allegations Regarding DBML ..................................................................................... 13

        3. EMS' Partnership and Agency Allegations Likewise Cannot Save Its Claims  Against
        DBML ............................................................................................................................. 17

        4. Conclusion .................................................................................................................. 17

II. PLAINTIFF SHOULD NOT BE PERMITTED DISCOVERY  ON ITS CLAIMS ............... 18

CONCLUSION ........................................................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Blair v. Infineon Technologies AG,*
    720 F. Supp. 2d 462 (D. Del. 2010) .................................................................6, 7

*Bootay v. KBR, Inc.,*
    437 Fed.Appx. 140 (3d Cir. 2011) .........................................................................6

*Curlett v. Madison Indus. Servs. Team, Ltd.,*
    863 F. Supp. 2d 357 (D. Del. 2012) ...............................................................6, 12

*Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.,*
    782 F.2d 329 (2d Cir. 1986) ...................................................................................7

*Hampton v. Navigation Capital Partners, Inc.,*
    C.A. No. 13-747-LPS, 2014 WL 4100418 (D. Del. Aug. 19, 2014) ........................8

*In re Arbitration between Holborn Oil Trading Co. and Interpetrol Bermuda Ltd.,*
    774 F. Supp. 840 (S.D.N.Y. 1991) .......................................................................17

*Mason Agency Ltd. v. Eastwind Hellas SA,*
    No. 09 Civ. 6474 (DLC), 2009 WL 3109821 (S.D.N.Y. Sept. 29, 2009) ..........5, 18

*Northern Tankers (Cyprus) Ltd. v. Adam Backstrom,*
    967 F. Supp. 1391 (D. Conn. 1997) .......................................................................7

*Oldendorff Carriers GmbH & Co. v. Grand China Shipping (Hong Kong) Co.,*
    C.A. No. C-12-074, 2012 WL 3260233 (S.D.Tex. July 2, 2012) .....................18, 19

*Oppenheimer & Co. v. Deutsche Bank AG,*
    No. 09 Civ. 8154 (LAP), 2010 WL 743915 (S.D.N.Y. Mar. 2, 2010) ...................14

*Pace v. Gen. Elec. Co.,*
    No. 1:00CV71-C, 2000 WL 1808986 (W.D.N.C. Apr. 25, 2000).........................13

*StrikeForce Technologies, Inc. v. PhoneFactor, Inc.,*
    Civ. A. No. 13-490-RGA-MPT, 2013 WL 6002850 (D. Del. Nov. 14, 2013)...........17, 19, 20

*Zubik v. Zubik,*
    384 F.2d 267 (3d Cir. 1967).............................................................................5, 7

**OTHER AUTHORITIES**

Rule 12(b)(6) of the Federal Rules of Civil Procedure.......................................................5, 19, 20

www.raetsmarine.com ...................................................................................................................2

## I.      STATEMENT OF THE NATURE AND STAGE OF PROCEEDINGS

Plaintiff Energy Marine Services Inc. ("EMS") filed its original complaint on January 6, 2015 against defendant DB Mobility Logistics AG ("DBML") and defendant Schenker Libya for Transport Services Company ("Schenker Libya") seeking a maritime attachment of DBML's property within this District.  [D.I. 1].  On January 8, this Court issued a writ of maritime attachment against all of DBML's property in the District in an amount of up to USD $1,511,573.00.  [D.I. 10].      Following the filing of the original complaint, DBML's counsel contacted EMS' counsel regarding an error in EMS' pleadings regarding the alleged corporate structure of DBML.  Thereafter, EMS filed its Amended and Supplemental Verified Complaint on March 2, 2015 (the "Amended Complaint" or "Am. Compl."), correcting the error and adding Schenker S.A. as a defendant.  [D.I. 20].  DBML now moves to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted.

## II.      SUMMARY OF ARGUMENT

DBML never owned shares in or controlled Schenker Libya.  Moreover, as shown by evidence in the record filed by EMS, the DBML subsidiary that once owned shares in Schenker Libya – *long ago and with full disclosure to EMS* – sold all of its shares to another shareholder. Despite full knowledge of these indisputable facts EMS filed this action (i) alleging – *without basis* – that Schenker Libya was the corporate alter ego of DBML, (ii) requesting that this Honorable Court pierce DBML's corporate veil, and (iii) seeking a maritime attachment of DBML's property within this District.  EMS fails to state a claim against DBML upon which relief may be granted.  The Amended Complaint should be dismissed with prejudice and EMS should be denied any request for discovery to resurrect these failed claims.

### III.   STATEMENT OF FACTS

#### A.   Background

In June 2008, Schenker Libya chartered the *AHTS TOUCAN* (the "Vessel") from EMS (the "Charter").  Am. Compl., ¶ 32.  The Vessel was delivered to Schenker Libya in late July 2008 and was redelivered nine months later.  *Id.* ¶ 34.  A dispute between Schenker Libya and EMS arose with regards to the Vessel's condition, as a result of which Schenker Libya withheld charter hire payments to EMS.  *Id.* ¶¶ 34-35.  After the Vessel's redelivery, Schenker Libya and EMS attempted to settle their dispute, with Schenker Libya being represented by a maritime expert from Schenker S.A. (its 65% share owner).  *Id.* ¶ 36.  The negotiations failed, however, and EMS initiated arbitration in London pursuant to the Charter's arbitration clause.  *Id.* ¶ 36, 37.

The arbitrators ordered both parties to provide security for costs.  *Id.* ¶ 41.  Schenker Libya's London solicitor advised that the Libyan civil unrest had disrupted communications and, in any event, they only had been receiving instructions from Schenker Libya's marine insurer, RaetsMarine,[1] rather than Schenker Libya itself.  *See* Declaration of John Benzonana dated Jan. 2, 2015 (the "Benzonana Decl."), Ex. 24 [D.I. 6-3, at 50] (stating "[w]e have been receiving instructions from Charterers [i.e., Schenker Libya] only through RaetsMarine").  When EMS' counsel asked why Schenker Libya's counsel could not merely receive instructions from another company in the Schenker group, *see id.*, Schenker Libya's solicitor replied that "the reason it is not possible to obtain instructions from Charterers via other companies in the Schenker group is that the Schenker group disposed of its interest in Charterers at the end of 2010."  *Id.*

Nearly two years later, EMS' U.S. counsel apparently contacted Schenker AG to inquire about the sale of Schenker Libya.  *Id.* ¶ 29 & Ex. 25 [D.I. 6-3, at 54-55].  EMS' U.S. counsel

---

[1]   Reference to www.raetsmarine.com (last visited on Mar. 9, 2015) provides access to RaetsMarine's internet home page and its description as a marine P&I ("protection and indemnity") insurer.

received a response from the general counsel of Schenker AG[2] that it had never directly owned shares in Schenker Libya, and that the former subsidiary of Schenker AG that **had** owned shares in Schenker Libya sold all of its shares to another shareholder.  *Id.*; Am. Compl., ¶ 43.

## B.    DBML's Indirect Shareholder Interest in Schenker Libya

At no time was DBML a direct shareholder of Schenker Libya.  *See* Am. Compl., ¶¶ 25-31, 41.  In June 2008, when EMS and Schenker Libya entered into the charter contract, Schenker Libya's immediate parent company was Medtrans International SAS ("Medtrans"), a French limited liability company.  Am. Compl., ¶ 25.  Medtrans owned 65% of Schenker Libya's shares, the other 35% of the shares being owned by another entity.  *Id*.  At no time did any company in the DB Schenker group own more or less than 65% of Schenker Libya's shares.  *See id*. ¶¶ 25-31.  Medtrans was in turn a wholly owned subsidiary of Schenker S.A., a French incorporated company.  *Id*. ¶¶ 25, 28.  Schenker S.A. was in turn a wholly owned subsidiary of Schenker AG, and Schenker AG was in turn a wholly owned subsidiary of DBML.

In October 2010, the corporate structure was modified.  Schenker AG transferred all of its shares in Schenker, S.A. to DB France Holding SAS, a recently-created French limited liability company ("DB France Holding").  DB France Holding became Schenker S.A.'s immediate parent, and in turn DB France Holding was a wholly owned subsidiary of DBML.  *Id*.  ¶ 24, 30.

In November 2010, Medtrans ceased doing business and Schenker SA took over its 65% of Schenker Libya.  *Id*. ¶¶ 26, 27.  In December 2010, Schenker SA sold all of its Schenker Libya shares to Schenker Libya's other shareholder.  *Id*. ¶¶ 31, 42.

---

[2]  Schenker AG (i.e., Aktiengesellschaft) is a German joint stock company with nearly 10,000 employees as of December 31, 2009 which is a direct subsidiary of DBML, *see* Second Declaration of John Benzonana dated Mar. 2, 2015, Ex. F [D.I. 20-2, at 12], and former parent of Schenker SA., a French corporation with nearly 1,300 employees as of December 31, 2009.  *See id.*  DB France Holding SAS became the parent of Schenker SA by virtue of a share transfer from Schenker AG in October 2010.

DBML's indirect shareholder interest in Schenker Libya can be shown as follows:

Up until October 2010:

| DB Mobility Logistics AG |
| :---: |

⬇ 100%

| Schenker AG |
| :---: |

⬇ 100%

| Schenker S.A. |
| :---: |

⬇ 100%

| Medtrans International SAS |
| :---: |

⬇ 65%

| Schenker Libya |
| :---: |

Up until November 2010

| DB Mobility Logistics AG |
| :---: |

⬇ 100%

| DB France Holding SAS |
| :---: |

⬇ 100%1

| Schenker S.A. |
| :---: |

⬇ 100%

| Medtrans International SAS |
| :---: |

⬇ 65%

| Schenker Libya |
| :---: |

From November 2010 to December 2010



| DB Mobility Logistics AG |
| :---: |

⬇ 100%

| DB France Holding SAS |
| :---: |

⬇ 00%

| Schenker S.A. |
| :---: |

⬇ 65%

| Schenker Libya |
| :---: |

4

As these diagrams show, DBML never was a direct shareholder of Schenker Libya.

## ARGUMENT

It is well-settled that when examining whether the liability of one entity can be shifted to another, admiralty courts − just like any other court – both inside and outside this Circuit employ the strong presumption that corporations are separate and distinct:

> In applying the test [as to whether a court should pierce an entity's corporate veil], however, any court must start from the general rule that the corporate entity should be recognized and upheld, unless specific, unusual circumstances call for an exception. [citation omitted].  Care should be taken on all occasions to avoid making "the entire theory of the corporate entity . . . useless."

*Zubik v. Zubik*, 384 F.2d 267, 273 (3d Cir. 1967) (quoting *Price Bar, Inc., Liquor License Case*, 203 Pa. Super. 481, 484, 201 A.2d 221, 222 (1964)) (additional citations omitted).

> Corporations are presumed to be distinct and independent entities.  "Under the doctrine of limited liability, a corporate entity is liable for the acts of a separate, related entity only under extraordinary circumstances, commonly referred to as piercing the corporate veil."  *Murray v. Miner*, 74 F.3d 402, 404 (2d Cir. 1996). The plaintiff bears the burden of adducing proof sufficient to demonstrate that such "extraordinary circumstances" exist.  *Id.*  In the absence of such a showing, [plaintiff]'s demonstration that it had a contract with [one entity] is insufficient to justify attaching and restraining the assets of [the defendant alleged to be liable under a veil-piercing theory].

*Mason Agency Ltd. v. Eastwind Hellas SA*, No. 09 Civ. 6474 (DLC), 2009 WL 3109821, at *5 (S.D.N.Y. Sept. 29, 2009).

EMS has failed to allege sufficient facts to warrant overcoming this presumption of corporate separateness.  The actual facts alleged do not reveal unusual circumstances that would call for an exception to the general rule.  Thus, the Amended Complaint should be dismissed for the failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

# I.   EMS' AMENDED COMPLAINT FAILS TO ALLEGE FACTS WHICH, IF PROVEN, PLAUSIBLY WOULD GIVE PLAINTIFF A RIGHT TO RELIEF

Although a complaint need only provide "a short and plain statement of the claim showing that the pleader is entitled to relief" and "does not need detailed factual allegations," the complaint will not withstand the Rule 12 threshold inquiry if it merely provides a "formulaic recitation of the elements of a cause of action." *Blair v. Infineon Technologies AG*, 720 F. Supp. 2d 462, 468 (D. Del. 2010) (citing and quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)). Taking the plaintiff's allegations as true, the court must find that the plaintiff's right to relief rises above the speculative. *Id.* Hence, "[t]o survive a motion to dismiss, [the plaintiff's] complaint must set forth 'enough facts to state a claim for relief that is plausible on its face.'" *Bootay v. KBR, Inc.*, 437 Fed.Appx. 140, 144 (3d Cir. 2011) (quoting *Twombly*, 550 U.S. at 570). In deciding a motion to dismiss, "[a] court may consider the pleadings, public record, orders, exhibits attached to the complaint, and documents incorporated into the complaint by reference." *Curlett v. Madison Indus. Servs. Team, Ltd.*, 863 F. Supp. 2d 357, 361 (D. Del. 2012) (citations omitted). As discussed below, EMS fails to meet its burden under either (a) Third Circuit precedent or (b) precedent from other Circuits.

## A.   Third Circuit Precedent Requires Fraudulent Intent

Third Circuit precedent requires a plaintiff seeking to impose derivative liability on a defendant on an alter ego or veil-piercing theory to allege some element of fraudulent intent:

> "In order to succeed on an alter ego theory of liability, plaintiffs must essentially demonstrate that, in all aspects of the business, the [ ] corporations actually functioned as a single entity and should be treated as such" . . . . An alter ego relationship may arise where "a corporate parent exercises complete domination and control over its subsidiary" . . . . Whether or not the alter ego test requires an element of fraudulent intent "is demonstrably an inquiry into whether the . . . corporation is little more than a legal fiction". . . . ***This court has required an element of fraudulent intent in its alter ego test***, as well as the traditional requirement that the corporation and its subsidiaries operated as a single economic entity (the "single entity test")**. . . .** Under the single entity test, the

6

Third Circuit has considered seven factors in determining whether a corporation operated as a single economic entity: (1) gross undercapitalization; (2) failure to observe corporate formalities; (3) non-payment of dividends; (4) insolvency of the debtor corporations at the time; (5) siphoning of the corporation's funds by the dominant stockholder; (6) absence of corporate records; and (7) whether the corporation is merely a facade. . . . ***While the list of factors is not exhaustive and no single factor is dispositive, some combination is required, and an overall element of fraud, injustice, or unfairness must always be present.***

*Blair*, 720 F. Supp. 2d at 470-71 (internal citations and footnotes omitted) (emphasis added).

As all parties to this appeal agree, the appropriate occasion for disregarding the corporate existence occurs ***when the court must prevent fraud, illegality, or injustice***, or when recognition of the corporate entity would defeat public policy or shield someone from liability for a crime. . . . There is no doubt that an admiralty court has as part of its general jurisdiction sufficient equitable powers to apply this test. . . .

*Zubik*, 384 F.2d at 272-73 (internal citations omitted) (emphasis added).

## B.    Other Circuits' Precedent

In other Circuits, courts have allowed corporate veil piercing in two circumstances: where the individual or corporate parent (1) "used the corporate entity to 'perpetuate a fraud'" or (2) "'have so dominated and disregarded' the corporate entity's form that the entity 'primarily transacted [the individual's or parent's] business rather than its own corporate business.'" *Dow Chem. Pac. Ltd. v. Rascator Maritime S.A.*, 782 F.2d 329, 342 (2d Cir. 1986) (quoting district court decision) (citations omitted).  The decision in *Northern Tankers (Cyprus) Ltd. v. Adam Backstrom*, 967 F. Supp. 1391, 1399-1401 (D. Conn. 1997), sets forth fifteen factors under maritime law that other Circuits have used to assess whether veil-piercing is appropriate.  These factors are not substitutes for the fraud or domination inquiry, but rather should be used to aid analyzing the specific situation:

(1) common or overlapping stock ownership between parent and subsidiary; (2) common or overlapping directors and officers; (3) use of same corporate office; (4) inadequate capitalization of subsidiary; (5) financing of subsidiary by parent; (6) parent exists solely as holding company of subsidiaries; (7) parent's use of subsidiaries' property and assets as its own; (8) informal intercorporate loan transactions; (9) incorporation of subsidiary caused by parent; (10) parent and

7

subsidiary's filing of consolidated income tax returns; (11) decision-making for subsidiary by parent and principals; (12) subsidiary's directors do not act independently in interest of subsidiary but in interest of parent; (13) contracts between parent and subsidiary that are more favorable to parent; (14) non-observance of formal legal requirements; (15) existence of fraud, wrongdoing or injustice to third parties.

*Id.* (citing *Bergensen d.y. A/S v. Magnus Lindholm*, 760 F. Supp. 976, 987 (D. Conn. 1991)).

## C.     EMS' Complaint Fails To Satisfy Either Test

On a motion to dismiss, this Court should take all well-pleaded allegations as true and draw all reasonable inferences in favor of the non-moving party.  *Hampton v. Navigation Capital Partners, Inc.*, C.A. No. 13-747-LPS, 2014 WL 4100418, *2 (D. Del. Aug. 19, 2014) (quoting *Maio v. Aetna, Inc.*, 221 F.3d 472, 500 (3d Cir. 2009)).  But this Court need not accept bald assertions, unsupported conclusions, or clearly false statements.  *See*, *e.g.*, *id.* (noting that on a motion to dismiss "the Court is not obligated to accept as true bald assertions, unsupported conclusions and unwarranted inferences, or allegation that are self-evidently false") (internal quotations and citations omitted).

Regardless of which veil piercing test this Court employs, the Amended Complaint does not state a claim against DBML which is non-speculative and plausible on its face.  In Paragraph 58 of the Amended Complaint, EMS states this Court should find that Schenker Libya is DBML's alter ego based on the allegations contained in paragraphs 7-31, 33-34, 38-44, and 53-57.  In examining the referenced paragraphs, however, two things become clear: (1) many of EMS' allegations relate to actions taken by companies other than DBML, and (2) the allegations which include DBML largely are generalized, bald assertions without any actual conduct alleged (or the conduct alleged, when examined closely, is not DBML's conduct, notwithstanding EMS' assertions to the contrary).  DBML turns to those allegations now.

8

1.  <u>Allegations Either not Involving DBML or Not Alleging DBML's Domination and Control of Schenker Libya</u>

Turning to EMS' allegations relating to actions taken by companies ***other than DBML*** allegedly in the "Schenker group" or the "Deutsche Bahn Group of companies," EMS alleges that the following actions of Schenker Libya should be considered:

- In carrying on its business ***<u>Schenker Libya held itself out</u>*** as "DB Schenker" by using that name in its official stamp, its stationary, its business forms, and in its correspondence, Am. Compl., ¶ 10.

- ***<u>Schenker Libya used</u>*** the letters "DB Schenker" in a trademark format that was owned by an entity called Deutsche Bahn AG, *id.* ¶¶ 11-14.

- ***<u>Schenker Libya represented</u>*** to EMS that matters relating to the performance of Charter, and disputes arising thereunder, were controlled by the "group's" corporate management and was delegated to the manager of the Marseilles branch of Schenker, S.A. in France, *id.* ¶¶ 18-19.

- ***<u>Schenker Libya used</u>*** an internet domain owned and registered by "Deutsche Bahn AG," *id.* ¶ 21.

- In the London arbitration, ***<u>solicitors representing Schenker Libya argued</u>*** that there was no need to order Schenker Libya to post security for costs as it was "part of a very large multinational business operation," *id.* ¶¶ 38-40.

- At all times, ***<u>Schenker Libya expressly represented</u>*** itself to be a branch and part of the Schenker Logistics Group, carrying on business under the "DB Schenker" brand, and having the economic backing and support of the said business organization, *id.* ¶ 52.[3]

- ***<u>Schenker Libya's London solicitors represented</u>*** to the arbitrators that they could not obtain instructions from their client or other companies in the Schenker group because "the Schenker group disposed of its interest in [Schenker Libya] at the end of 2010," *id.* ¶¶ 31, 41 (yet, despite the "Schenker group" having sold its shares in Schenker Libya in December 2010, Schenker Libya continued to participate in the arbitration (*id.* ¶ 42)).

As can be seen, the foregoing allegations relate to actions ***taken by <u>Schenker Libya</u> or representations made by <u>Schenker Libya</u> or its solicitors***.  None of those allegations relate to any actions ***<u>taken by DBML</u>*** to control or dominate Schenker Libya.

---

[3]  Paragraph 52 and paragraph 36 of the Amended Complaint are not listed by EMS as being allegations related to the alter ego relationship, but DBML has included them as well as their content clearly relates to those allegations.

This Court should disregard the allegations concerning comments made by Schenker Libya's solicitor in the London arbitration because there are no allegations that the solicitor was instructed, controlled, or even in contact with DBML, or that DBML supported or otherwise endorsed the solicitor's comments.  To the contrary, as shown by EMS' own allegations and exhibits − Schenker Libya's interests in that arbitration were being represented by solicitors without direct contact with Schenker Libya who were instructed by RaetsMarine (a marine insurance company).  Benzonana Decl., Ex. 24 [D.I. 6-3, at 50].  Furthermore, Schenker Libya (and its solicitor) participated in the arbitration for at least six months after its shares held by Schenker S.A. were sold to its other shareholder and DBML no longer had any interest in the company.  Am. Compl., ¶ 42.

Hence, the allegations related to the solicitor's statements in the London arbitration that Schenker Libya should not have to post security because it was "part of a very large multinational business operation" should carry no weight as to establishing DBML's domination and control over Schenker Libya.  They were made by a person having no contact with, and no authority from, DBML.  Yet the solicitor's statements repeatedly are referenced in EMS' allegations.  *See* Am. Compl., ¶¶ 16, 31, 38-42, 44, 52 & 55; Benzonana Exs. 21-24 [D.I. 6-3, at 39-50].  One quarter of EMS' alter ego allegations against DBML are related to the statements of a solicitor who (according to EMS' own allegations and exhibits) (1) had no contact with DBML and no authority from DBML, (2) was not being directly instructed by any company in the Schenker family of companies, and (3) continued representing Schenker Libya for months after Schenker S.A. sold its shares (and after the Schenker family of company's interest in the arbitration had ceased).  There is no suggestion that the solicitor's statements were made with the support of anyone in the Schenker family of companies, much less by DBML.

This Court should also disregard the above allegations concerning Schenker Libya's use of the "DB Schenker" brand because those allegations relate to Deutsche Bahn, the owner of the mark, not DBML.  *See* Am. Compl., ¶¶ 10-14, 21.  Thus, those allegations have no relevance to whether this Court should disregard DBML's corporate veil.

Similarly, the Amended Complaint contains many allegations regarding other corporate entities allegedly in the "Schenker Group" or the "Deutsche Bahn Group of companies:"

- "[I]t was resolved by the management of the Deutsche Bahn Group to hive off the passenger transport and logistics sectors to form the company DB Mobility Logistics AG (DB ML AL)," *id.* ¶ 15.

- "[A]ll major decisions relating to the business carried on by SCHENKER LIBYA with [EMS], were made by ***executives of subsidiaries of the DBMLAG group*** who were neither officers, nor directors nor even employees of SCHENKER LIBYA," *id.* ¶ 17.

- The financial director of Schenker's Africa region ***was employed by Schenker S.A. (France)*** and controlled the finances of Schenker Libya, *id.* ¶¶ 18-19.

- After Schenker Libya's redelivery of the Vessel to EMS, ***the branch manager of Schenker Marseille, France conducted negotiations*** on behalf of Schenker Libya with respect to the withheld charter hire payments, *id.* ¶ 36.

- The Charter was signed by the ***general manager of Schenker Mauritania***, *id.* ¶ 33.[4]

---

[4] EMS also claims that the following allegations relate to DBML's alter ego status:

- ***Schenker AG represented*** that Schenker Libya had been sold to "other shareholders," but would not identify to EMS the buyer of the shares or any other details about the transaction, *id.* ¶ 43.

- ***DBML's U.S. counsel provided flow charts to EMS' U.S. counsel*** showing corporate structure of relevant portion of Deutsche Bahn group, *id.* ¶ 22.

- ***DBML is the indirect shareholder*** of the controlling shareholder interest of Schenker Libya, *id.* ¶ 23.

- ***DB France Holding*** was not formed until after the Vessel was chartered and redelivered, *id.* ¶ 24.

- ***Medtrans*** owned 65% of shares of Schenker Libya, de-registered in November 2010, and Medtrans' shares passed to Schenker S.A.), *id.* ¶¶ 25-28.

- DBML's 2009 annual report lists Schenker SA as a subsidiary of DBML but does not mention DB France Holding SAS, whereas the 2010 annual report shows both as subsidiaries, *id.* ¶¶ 29-30.

- Charter hire was not paid for the Vessel, *id.* ¶ 34. (cont'd on next page)

As with the Schenker Libya allegations, none of the allegations related to the actions taken or the representations made by other corporate entities in the "Schenker Group" or the "Deutsche Bahn Group of companies" relate to actions taken by DBML to control or dominate Schenker Libya.  Hence, of the 41 paragraphs (i.e., 7-31, 33-34, 36, 38-44, and 52-57) of the Amended Complaint pled by EMS to be the basis for its alter ego theory against DBML, a total of 31 of those paragraphs (i.e., 8-14, 17-19, 21-31, 33-34, 36, 38-43, 52) do not even relate to DBML, let alone any control or domination of Schenker Libya.  Stated another way, over 75% of EMS' allegations it claims are relevant to the alter ego inquiry do not even pertain to DBML.

Furthermore, several of the foregoing allegations − even though they should be irrelevant as they do not relate to DBML's actions − are inaccurate or misleading.  For example, several paragraphs allege that actions were taken by personnel unrelated to Schenker Libya but rather were employees or managerial members of other Schenker companies.  *See*, *e.g.*, Am. Compl., ¶¶ 8, 9, 17-19, 33.  But the personnel referenced **_are_** rostered on the Schenker Libya contact list. *See* Benzonana Decl., Ex. 7 [D.I. 6-2, at 2-4].  While there certainly are personnel who were "wearing two hats" for separate Schenker entities − *e.g.*, Karim Azaiz is alleged to have been the General Manager and President of Schenker Mauritania and also is listed as the General Manager of Schenker Libya, and Hedi Rguigui was the financial manager for both Schenker SA and Schenker Libya − this is quite different than the situation where a person with no connection with a company imposes his/her will upon that company.  *See*, *e.g.*, *Curlett v. Madison Indus. Servs. Team, Ltd.*, 863 F. Supp. 2d 357, 361 (D. Del. 2012) (noting that "close relationships, even to the point where the subsidiary's management is run by the parent's employees, are not

---

As these allegations are at best tangentially related to the issue of DBML's alter ego status, in the interest of space DBML merely notes that EMS included the foregoing paragraphs as somehow relevant to the alter ego inquiry.

sufficient to hold the parent liable for the subsidiary's actions unless the 'subsidiary is in fact a mere instrumentality or alter ego of its parent.'") (quoting *Albert v. Alex. Brown Mgmt. Servs., Inc.*, Civ. A. 762-N/763-N, 2005 WL 2130607, at *9 (Del. Ch. Aug. 26, 2005)).[5]

2.    Allegations Regarding DBML

The Amended Complaint contains no allegations with regard to any specific act that DBML took to dominate and control Schenker Libya.  Nor does it contain any allegations as to specific actions of DBML taken to dominate and control any of the corporate entities situated between DBML and Schenker Libya or above DBML that it allegedly used to control Schenker Libya.  Rather, with respect to specific, definitive actions alleged to have been taken by DBML, EMS only makes the following allegations:

- "DBMLAG, either directly or through intermediary holding companies it controlled, was the controlling parent company of SCHENKER LIBYA and SCHENKER SA through which DBMLAG carried on business in the areas of oil field logistics support services and transportation." Am. Compl., ¶ 7.

- "DBMLAG carried on its Libyan business through SCHENKER LIBYA and SCHENKER SA ***using personnel employed by the said, and other, subsidiaries*** that were part of its worldwide logistics network situated in a number of countries including its subsidiary in France - Schenker S.A. Marseille branch; and Schenker Mauritania, in addition to personnel resident and employed in Libya," *id.* ¶ 8.

- "DBMLAG in carrying on its Libyan business in the name of SCHENKER LIBYA ***employed departments and personnel of its subsidiaries situated in countries other than Libya***, particularly SCHENKER SA as if they were departments and personnel integrated with SCHENKER LIBYA," *id.* ¶ 9.

---

[5] Similarly, EMS seeks to gain traction with its allegations concerning the participation of Sami Elkeilany and an in-house attorney from the Schenker Group in settlement negotiations with EMS.  *See* Benzonana Decl. ¶¶ 19, 20, and 22.  As EMS' exhibits demonstrate, however, Schenker Libya essentially retained Mr. Elkeilany (a "maritime expert") and a lawyer to assist it with a legal dispute.  *Id.*, Exs. 16, 17, 20 [D.I. 6-3, at 4-25, 36-38].  Rather than having to hire outside consultants for negotiations, Schenker Libya was able to draw upon such resources from inside the Schenker organization.  This hardly suggests domination of Schenker Libya, and certainly does not suggest domination by DBML.  *See, e.g., Pace v. Gen. Elec. Co.*, No. 1:00CV71-C, 2000 WL 1808986, at *2 (W.D.N.C. Apr. 25, 2000) (granting motion to dismiss on alter ego claim and rejecting plaintiff's contention that joint in-house attorney for separate General Electric entities constituted allegation sufficient to avoid dismissal, holding that "***the mere fact that GELS and GE share in-house counsel is insufficient to pierce the corporate veil***.") (citing *Sheets v. Yamaha Motors Corp, U.S.A.*, 891 F.2d 533, 538 (5th Cir. 1990)).

These allegations contain nothing more than bald assertions in support of EMS' alter ego allegations. EMS makes no specific allegations of how DBML controlled or dominated Schenker Libya (or any of DBML's intermediary subsidiaries which indirectly or directly held shares of Schenker Libya). As such, these allegations should be given no weight by the Court.

- DBML "held out SCHENKER LIBYA to be part of its own worldwide logistics business operations with its solvency backed up by the financial resources of DBMLAG's worldwide logistics organization," *id.* ¶ 16.

- "Defendants DBMLAG, SCHENKER S.A. and SCHENKER LIBYA expressly represented SCHENKER LIBYA to be a branch and part of the Schenker Logistics Group, carrying on business under the well known 'DB SCHENKER' brand, and having the economic backing and support of the said well known business organization," *id.* ¶ 52.

These allegations are bald assertions and self-evidently false. Paragraph 16 of the Amended Complaint recites paragraphs 24-26 of the Benzonana Declaration and its Exhibits 21-23 as support. These "supports" refer to the statements of Schenker Libya's London solicitor, a person (as discussed above) with no contact with DBML. They should be given no weight by this Court. With respect to Paragraph 52, it refers to no support whatsoever.

- DBML "issued consolidated annual reports which listed its revenue from the operations of SCHENKER LIBYA as its own revenue," *id.* ¶ 20.

Consolidated annual reports have little if any bearing on the alter ego analysis. As recently noted by the Chief Judge of the Southern District of New York: "***consolidated financial reports*** *and* ***overlapping directors and officers*** *'are commonplace as generally-accepted corporate form, and* ***are insufficient without more, as a matter of law, to eviscerate the presumption of corporate separateness.***'" *Oppenheimer & Co. v. Deutsche Bank AG*, No. 09 Civ. 8154 (LAP), 2010 WL 743915, at *4-5 (S.D.N.Y. Mar. 2, 2010) (citation omitted) (emphasis added). Therefore, a consolidated annual report is of minimal significance and is insufficient to save EMS' claim.

14

- "As a result of: the sale of the controlling equity of SCHENKER LIBYA to new shareholders; the divestiture of DBMLAG's in same; the disaffiliation of SCHENKER LIBYA from 'the very large multinational business operation', of which it was represented a part; what came about was the virtual liquidation of SCHENKER LIBYA and a complete change of its identity, so that the respondent before the arbitration tribunal is no longer SCHENKER LIBYA, but a complete sham," *id.* ¶ 44.

- "As a result of these actions of DBMLAG and/or its agent SCHENKER S.A., SCHENKER LIBYA was stripped of its corporate identity, valuable assets and ceased to exist as a viable corporate entity, while its controlling shareholder DBMLAG received and appropriated to itself the proceeds of the sale of the company to its minority shareholder," *id.* ¶ 54.

These two paragraphs contain similar bald assertions and unsupported conclusions. Taking the final portion of Paragraph 44 first, EMS claims that a "virtual liquidation of SCHENKER LIBYA" has occurred. EMS has not taken its claim to an award in London, much less sought to enforce an award. There simply is no basis by which EMS creditably can allege that Schenker Libya has been "virtually liquidated" − this allegation is a bald assertion or unwarranted conclusion that the Court should not credit. Indeed, the Benzonana Exhibits show that Schenker Libya participated in the London arbitration for months after Schenker S.A. sold its shares to the minority shareholder. Furthermore, Schenker Libya's London solicitors have not stated that Schenker Libya is defunct, they merely reported that communications were difficult in light of the civil unrest in Libya. With respect to the "very large multinational business operation" allegation, this merely recycles the London solicitor's representations. Finally, with respect to EMS' allegation that DBML divested itself of the Schenker Libya shares, the corporate ownership structure of the Schenker group makes clear that DBML did not divest itself of the shares. EMS likewise provides no basis for its bald assertion that DBML "received and appropriated to itself the proceeds of the sale" (which, in fact, it did not). Hence, these allegations should be given no weight by the Court.

- "DBMLAG acting alone or by and through the agency of its wholly owned subsidiary SCHENKER SA, abused the corporate form of SCHENKER LIBYA, through which it had engaged in business for profit by: (1) selling and transferring SCHENKER

15

LIBYA to third parties; (2) entering into arrangements whereby the corporate name 'SCHENKER LIBYA' and the 'DB SCHENKER' were stripped from SCHENKER LIBYA and these brands no longer identified the entity with which Plaintiff had contracted; (3) disaffiliating the former SCHENKER LIBYA from the DBML Group and the DB SCHENKER logistics and transportation organization, had incurred its obligations to Plaintiff claimed in ongoing London arbitration; (4) failing to establish reserves or make other arrangements for the eventual payment of Plaintiff's claims in London arbitration, in the event that Plaintiff ENERGY MARINE prevailed," *id.* ¶ 53.

- "SCHENKER LIBYA was a branch, a department, and an agent, in the greater international logistics business carried on by its parent company DBMLAG under the brand name DB SCHENKER, as evidenced by the following: (a) SCHENKER LIBYA engaged in business under the trade name and brand DB SCHENKER, the brand of the international logistics business of Defendant DBMLAG; (b) In carrying on business with Plaintiff defendant SCHENKERLIBYA's [*sic*] decisions and actions were those of corporate departments and personnel that belonged to other corporate business entities controlled [by] the DBMLAG group.  These included SCHENKER SA, the wholly owned subsidiary of Defendant DBMLAG, which acted as an intermediary holding company and through its personnel carried on the business of SCHENKER LIBYA. (c) DBMLAG entirely dominated SCHENKER LIBYA, commingling assets, corporate brand names, trademarks, business goodwill, and personnel with those of other subsidiaries of the DB Schenker group so that SCHENKER LIBYA was indistinguishable from these purportedly separate business entities. (d) DBMLAG filed consolidated financial statements with SCHENKER LIBYA contained in DBMLAG's annual reports recording profits and losses of SCHENKER LIBYA as its own. (e)  All major decisions on behalf of SCHENKER LIBYA, including its sale to alleged minority shareholders, and cessation of carrying on business in its own corporate name, and its disaffiliation from the DBML Group were made not by independent officers and/or directors acting in the best interest of SCHENKER LIBYA, but in the best interest of DBMLAG.  (f)  DBMLAG, as the controlling shareholder, not only failed to adequately capitalize SCHENKER LIBYA, so that it would be capable of responsible to its obligations to creditors but also renounced any association of the 'former SCHENKER LIBYA' with the DBMLAG Group; and withdrew from the said Defendant its shared 'DB SCHENKER' trade mark; its corporate brand names; business goodwill; and affiliation at a time critical for SCHENKER LIBYA's economic survival," *id.* ¶ 55.

In these paragraphs, EMS seeks to bootstrap the limited evidence that it has with respect to other Schenker entities and then make general, unsupported allegations against DBML where no facts exist.  For example, EMS uses the interaction between Schenker S.A. and Schenker Libya and seeks to jump multiple corporate levels to DBML without any supporting facts.  Similarly, EMS recites use of the "DB Schenker" brand and trademarks (which in itself is hardly actionable), but the "brand" and trademark is not owned by DBML.  Finally, as discussed above,

16

there is no credible information to suggest that Schenker Libya was or is insolvent.  The mere recital of actions that could create alter ego liability are insufficient to state a claim − instead the allegations must be sufficient for the Court to find that the plaintiff's claim is plausible.  Here, EMS' allegations do not meet this standard and EMS' claim must be dismissed.

> 3.     EMS' Partnership and Agency Allegations Likewise Cannot Save Its Claims Against DBML

The Amended Complaint contains two paragraphs that allege, wholly without any specificity, that the Defendants were "co-partners" and each other's agents.  Am. Compl., ¶¶ 56, 57.  As noted by a court in this District:

> While agency theory requires a close connection between the relationship of the corporations and the cause of action, it does not apply solely because the parent has dominion and control over the subsidiary.  Under this theory, ___only the conduct shown to be instigated by the parent may be attributed to the parent.___

*StrikeForce Technologies, Inc. v. PhoneFactor, Inc.*, Civ. A. No. 13-490-RGA-MPT, 2013 WL 6002850, at *5 (D. Del. Nov. 14, 2013) (internal citations omitted) (emphasis supplied).

EMS provides no allegations that DBML "instigated" any of the actions taken by Schenker Libya with respect to chartering the Vessel or those of Schenker S.A. with respect to selling the Schenker Libya shares.  Similarly, there is no explanation why corporate parents and subsidiaries would be deemed to have the legal relationship of partners.  These allegations merely are one last ditch effort to save EMS' claim against DBML.

> 4.     Conclusion

In sum, here there are none of the indicia of total domination and control which are the hallmarks of a legitimate alter ego/veil-piercing claim.  *See*, *e.g.*, *In re Arbitration between Holborn Oil Trading Co. and Interpetrol Bermuda Ltd.*, 774 F. Supp. 840, 844 (S.D.N.Y. 1991).  With respect to the Third Circuit's "single entity test," EMS has not plausibly alleged gross undercapitalization, non-payment of dividends, insolvency of the defendants, siphoning of

17

Schenker Libya's funds by its dominant stockholder, an absence of corporate records, or whether the corporation is merely a facade. Even under a domination and control theory employed in other Circuits, EMS falls woefully short of the mark. While there are a few plausible allegations of Schenker France or Schenker Mauritania personnel wearing "two hats," there is no showing of any facts which would justify piercing of the multiple corporate layers between Schenker Libya and DBML. There are no allegations showing a disregard of the corporate form, no showing of commingling of assets, and certainly no showing of fraud as required by the Third Circuit. Accordingly, this Court should grant DBML's motion to dismiss EMS' claims against DBML for failing to state a claim upon which relief may be granted.

## II.    PLAINTIFF SHOULD NOT BE PERMITTED DISCOVERY ON ITS CLAIMS

It is a common strategy of plaintiffs seeking to use veil-piercing or alter ego claims as a security device to request "limited discovery" as an aid to bootstrap their bare bones allegations into something with more substance. *See, e.g.*, *Mason Agency Ltd. v. Eastwind Hellas SA*, No. 09 Civ. 6474 (DLC), 2009 WL 3109821, at *7 (S.D.N.Y. Sept. 29, 2009) (request for "limited discovery" on alter ego claims made by EMS' out-of-state law firm in this proceeding, which request was denied by the court as "[plaintiff] has alleged no facts tending to show that [the alleged alter ego] was a party to the [underlying contracts], nor any facts tending to suggest that [the alleged alter ego] has been unjustly enriched or is liable on an account stated."). Some courts will permit such limited discovery in connection with a defendant's motion to vacate attachment under Supplemental Rule E where a plaintiff has alleged sufficient facts to create a need for fact finding. *See, e.g.*, *Oldendorff Carriers GmbH & Co. v. Grand China Shipping (Hong Kong) Co.*, C.A. No. C-12-074, 2012 WL 3260233, *8 (S.D.Tex. July 2, 2012) (Rule B alter ego attachment claim brought by EMS' out-of-state law firm in this case; court observed

"[a] number of decisions relied on by [plaintiff] in support of [limited discovery], however, permit discovery only *after* it has been determined that the pleadings contained sufficient facts on which to support a claim for relief. . . . By the time discovery was allowed, those courts were no longer assuming the truth of the facts asserted and were instead engaging in a factfinding inquiry to determine if continued attachment was proper. Because [plaintiff] has not yet alleged sufficient facts to satisfy Rule 12(b)(6) that [the alleged alter ego defendants] can be held liable, those decisions do not establish that discovery is appropriate here.") (emphasis in original).[6]

Unlike the procedural posture of those cases, however, this motion to dismiss pursuant to Rule 12(b)(6) only presents the issue of whether EMS' complaint has stated a claim against DBML upon which relief may be granted. No issues of subject matter or personal jurisdiction have been raised by this motion. Hence, there is no need for discovery to be permitted.

In *StrikeForce Technologies*, the court ruled as follows in a similar context:

> After noting [relevant case law] and then implicitly conceding the requirement of fraud or similar injustice element, StrikeForce argues the alter ego test is highly fact-specific and requires balancing many factors viewed in the totality of the circumstances. While this may be true for a final determination of alter ego liability, *a plaintiff, however, must allege facts supporting the fraud or injustice requirement for alter ego liability to establish a well-pleaded complaint.* StrikeForce suggests that if allowed to conduct discovery, it would provide this court all the factors necessary to conduct a meaningful alter ego analysis.

---

[6] The magistrate judge's decision in *Oldendorff Carriers* effectively was reversed by the district judge in an unpublished decision, *Oldendorff Carriers GmbH & Co. v. Grand China Shipping (Hong Kong) Co.*, C.A. No. C-12-074, D. I. 48 (S.D.Tex. Oct. 10, 2012), on grounds that whether the court properly had a maritime attachment over the alter ego defendants' property was a question going to the court's subject matter and/or personal jurisdiction over the alter ego defendants. *See id.* (noting that "[w]hen a factual question governs the Court's jurisdiction, the Plaintiff must have ample opportunity to secure and present evidence relevant to the jurisdictional question.") (citations omitted). As a result, the district court ordered that the parties engage in jurisdictional discovery. *Id.* Here, while DBML does not concede that this Court has jurisdiction over DBML or that the Court's maritime attachment order against DBML is appropriate, DBML's current motion before this Court is limited to the Rule 12(b)(6) question of whether the Amended Complaint has stated a claim upon which relief has been granted. Hence, DBML's motion does not raise the jurisdictional issues noted by the district judge in *Oldendorff Carriers*.

StrikeForce's argument undermines the purpose of the well-pled complaint requirement. ___**This requirement "does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions."**___ Here, StrikeForce knocks without suggesting fraud or injustice, nor alleging any facts supporting either element. Consequentially, its alter ego theory is inadequate [*sic*] faulty when measured against the requirements of Rule 12(b)(6).

*Id.* (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009)) (internal footnotes omitted) (emphasis added).

Here, this Court should follow the recent *StrikeForce Technologies* decision. EMS has brought this claim against DBML for a simple reason: DBML is "upstream" of Schenker Libya in the Deutsche Bahn corporate family and happens to have assets present in the United States, against which EMS could obtain a maritime attachment in an effort to leverage (or, to use a better term, extort) a settlement from DBML. EMS has not alleged any facts that truly support its alleged alter ego claim. EMS should not be permitted to embark on fishing expedition in an attempt to shore up a speculative alter ego claim against a target of opportunity.

## CONCLUSION

Using either the Third Circuit's fraud-based alter ego inquiry or other Circuits' dual inquiry, the Amended Complaint fails to state a claim against DBML upon which relief may be granted. Accordingly, EMS' claim against DBML should be dismissed. Furthermore, this Court should not allow EMS limited discovery on its claims, as the U.S. Supreme Court has made clear that a defectively-alleged complaint is not the key by which the discovery door may be opened.

March 9, 2015

*Of Counsel:*

HOLLAND & KNIGHT LLP
Michael J. Frevola (pro hac vice
application forthcoming)
F. Robert Denig (pro hac vice
application forthcoming)
31 West 52nd Street
New York, New York 10019
Tel: (212) 513-3200
Email: michael.frevola@hklaw.com

01:16781284.3

Respectfully submitted,

YOUNG CONAWAY STARGATT
& TAYLOR, LLP

*/s/ James M. Lennon*
James M. Lennon (No. 4570)
Rodney Square
1000 North King Street
Wilmington, DE 19801
(302) 571-5009
jlennon@ycst.com

*Attorneys for Defendant*
*DB Mobility Logistics AG*

## <u>CERTIFICATE OF SERVICE</u>

I, James M. Lennon, hereby certify that on March 9, 2015, I caused to be electronically

filed a copy of the foregoing document with the Clerk of the Court using CM/ECF, which will

send notification that such filing is available for viewing and downloading to the following

counsel of record:

Michael B. McCauley, Esquire
Palmer Biezup & Henderson LLP
1223 Foulk Road
Wilmington, DE 19803
*mccauley@pbh.com*

*Attorneys for Plaintiff*

Raymond W. Cobb, Esquire
Raymond W. Cobb, LLC
1523 Concord Pike, Suite 200
Brandywine Plaza East
Wilmington, DE  19803
*rcobb@cobbllc.com*

*Attorneys for Garnishees DB US Holding Corporation and
DB US Corporation*

I further certify that on March 9, 2015, I caused a copy of the foregoing

document to be served by e-mail on the above-listed counsel and on the following:

George A. Gaitas, Esquire
Chalos & Co., P.C…
7210 Tickner Street
Houston, TX 77055
*ggaitas@chaloslaw.com*

*Attorneys for Plaintiff*

James W. Bartlett, III, Esquire
Imran O. Shaukat, Esquire
Semmes, Bowen & Semmes
25 South Charles Street, Suite 1400
Baltimore, MD  21201
*jbartlett@semmes.com*
*ishaukat@semmes.com*

*Attorneys for Garnishees DB US Holding Corporation and*
*DB US Corporation*


YOUNG CONAWAY STARGATT
   & TAYLOR, LLP

 */s/ James M. Lennon*
James M. Lennon (No. 4570)
Rodney Square
1000 N. King Street
Wilmington, DE 19801
jlennon@ycst.com
(302) 571-6600

*Attorney for Defendant DB Mobility Logistics AG*

01:16694043.1