IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| ENERGY MARINE SERVICES, INC., )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>DB MOBILITY LOGISTICS AG, )<br>SCHENKER LIBYA FOR TRANSPORT )<br>SERVICE COMPANY, and )<br>SCHENKER S.A. )<br>)<br>Defendants. )<br>_____) | Civil Action No. 15-24-GMS |

## MEMORANDUM

### I. INTRODUCTION

On January 6, 2015, plaintiff Energy Marine Services, Inc. ("EMS") filed this civil action in Admiralty. (D.I. 1.) EMS has named several entities in the DB Mobility Logistics AG ("DBMLAG") family of companies as defendants, including parent DBMLAG, and subsidiaries Schenker Libya for Transport Services Company ("Schenker Libya") and Schenker SA. (D.I. 1.) EMS lists three grounds under which it asserts DBMLAG is liable for a maritime arbitration judgment against Schenker Libya: an alter-ego claim, an agency claim, and a partnership claim. (D.I. 20 at ¶¶ 7–9; D.I. 20 at ¶¶ 58–60; D.I. 28 at 16.) In a separate motion, EMS requested and was granted a maritime attachment against property present in this district belonging to DBMLAG. (D.I. 3; D.I. 9.) Presently before the court is DBMLAG's motion under Federal Rule of Civil Procedure 12(b)(6) to dismiss the complaint for failure to state a claim upon which relief may be granted. (D.I. 21.) For the reasons discussed below, the court will grant the motion to dismiss.

## II. BACKGROUND

DBMLAG is a complex multi-national shipping and logistics company that operates through a network of independent, often national, subsidiaries. (D.I. 22 at 4; D.I. 20, Ex. 26.) Until December 2010, DBMLAG was an indirect shareholder, via three other corporate entities, in co-defendant Schenker Libya. (D.I. 22 at 3–4.) DBMLAG has acknowledged relationships with these several entities. DBMLAG owns all the shares in Schenker AG. (*Id.* at 4.) Schenker AG in turn owns a complete interest in the French subsidiary, Schenker SA. (*Id.*) Until November 2010, Schenker SA owned a complete interest in Medtrans International SAS, and Medtrans International SAS owned a 65% interest in Schenker Libya. (*Id.*) This four-link chain connected DBMLAG to Schenker Libya.

Schenker Libya chartered the AHTS TOUCAN from EMS in June 2008. (D.I. 20 at ¶ 32.) A dispute arose between EMS and Schenker Libya about the condition of the TOUCAN, leading Schenker Libya to withhold charter party payment. (*Id.* at ¶ 35.) This dispute resulted in the London maritime arbitration action filed on June 6, 2010. (*Id.* at ¶¶ 34–37.) EMS prevailed in the London arbitration against Schenker Libya and was awarded money damages.[1] (*Id.* at ¶¶ 57–58.)

DBMLAG and the four subsidiaries, including Schenker Libya, share common branding, logos, and email address format. (*Id.* at ¶¶ 10–14, ¶ 21; Ex. 8.) Some Schenker SA personnel also appear to have had roles in Schenker Libya. (*Id.* at ¶¶ 19–20; *see* D.I. 6, Ex. 20.) There are a series of email messages between various Schenker SA and Schenker Libya personnel demonstrating close coordination of the logistics directly related to the TOUCAN charter. (D.I. 6, Exs. 12, 15–16.) Some email messages also include employees from other Schenker subsidiaries not party to this lawsuit. (D.I. 6, Ex. 16.) These messages relate generally to port logistics and assessing the

---

[1] EMS claims $1,511,573, which includes the arbitration damage award, quarterly compounded interest at 6%, unpaid dry dock and maintenance fees, and arbitration costs. (D.I. 20 at ¶¶ 45–47.)

2

operational readiness of the TOUCAN. (D.I. 6, Exs. 15–16.) One email sent by a Schenker Libya employee refers to Schenker Libya as "Schenker DB J/V, Libya – Respol 2008 Offshore Project." (D.I. 6, Ex. 12.) A Schenker Libya phone list shows local Benghazi contact information for a variety for Schenker Libya, Schenker SA, and Saraha Company personnel. (D.I. 6, Ex. 26.)

Medtrans International SAS ceased doing business in November 2010, transferring its 65% interest in Schekner Libya to Schenker SA. (D.I. 22 at 3.) A month later, Schenker SA sold all its shares in Schenker Libya to the other Schenker Libya shareholder, severing the relationship. (D.I. 22 at 3–4.)

## III. STANDARD OF REVIEW

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal where the plaintiff "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In considering a motion to dismiss, the court "accept[s] all factual allegations as true, construe[s] the complaint in the light most favorable to the plaintiff, and determine[s] whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008). The issue for the court is "not whether the plaintiff will ultimately prevail, but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974). As such, the touchstone of the pleading standard is plausibility. *Bistrian v. Levi*, 696 F.3d 352, 365 (3d Cir. 2012). In cases that involve allegations of fraud, "a party must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b).

Plaintiffs must provide sufficient factual allegations "to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). In the absence of inequity or futility, parties subject to a dismissal under Rule 12(b)(6) may seek to cure the pleading defects by amendment. *Phillips*, 515 F.3d at 236.

## IV. DISCUSSION

As a threshold matter, the parties dispute whether a Rule 12(b)(6) motion to dismiss is a proper means to dispose of a Rule 9(h) action in admiralty. After addressing this procedural issue, the court will address whether EMS has sufficiently plead its alter-ego, agency, and partnership claims against DBMLAG.

### A. Applicability of Rule 12(b)(6)

EMS argues that Federal Rule of Civil Procedure 12 does not apply in admiralty actions, but rather that Supplemental Rule E alone should govern. (D.I. 28 at 5.) Other than the exceptions enumerated in Rule 81, the Federal Rules of Civil Procedure apply to all civil actions. Fed. R. Civ. P. 1. The Supplementary Rules explicitly state that the Federal Rules of Civil Procedure apply in admiralty "except to the extent that they are inconsistent" with the Supplemental Rules. Supp. R. A; *see also United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 149 (3d Cir. 2003) (acknowledging the relationship between the civil rules and supplementary rules when considering the relationship between Rule 12 and Supplemental Rule C(6)). Although the Third Circuit has not directly addressed the applicability of Rule 12 to admiralty attachment actions, sister circuits have found no collision here between the primary and supplemental rules. *See, e.g., Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013) (distinguishing the remedies under Supplemental Rule E from those under Rule 12); *Chiquita Int'l Ltd. v. MV Bosse*, 518 F. Supp. 2d 589, 596 (S.D.N.Y. 2007) (stating that Rule 12 is the proper vehicle for motions to dismiss). Based on the plain language of the Federal Rules of Civil Procedure, the court will apply Rule 12

4

uniformly to civil actions in admiralty. A motion under Rule 12(b)(6) is the proper vehicle to seek dismissal of the underlying suit; a motion under Supplemental Rule E is the proper vehicle to move the court to vacate a maritime attachment. *See Vitol*, 708 F.3d at 548–49.

### B. Alter-Ego Claim

EMS first claims that DBMLAG may be held liable for the actions of Schenker Libya through the alter-ego theory. The alter-ego analysis weighs the following factors: "gross undercapitalization, failure to observe corporate formalities, nonpayment of dividends, insolvency of debtor corporation, siphoning of funds from the debtor corporation by the dominant stockholder, nonfunctioning of officers and directors, absence of corporate records, and whether the corporation is merely a facade for the operations of the dominant stockholder." *Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484–85 (3d Cir. 2001). Under the alter-ego test, the plaintiff is required to show, in essence, "that in all aspects of the business, the . . . corporations actually functioned as a single entity." *Pearson*, 247 F.3d at 485. The plaintiff must also prove that the corporate form was abused, with a showing akin to fraud. *Trustees of Nat'l Elevator Indus. Pension, Health Benefit and Educ. Funds v. Lutyk*, 332 F.3d 188, 194 n.7 (3d Cir. 2003).

Although EMS alleges that DBMLAG operated Schenker Libya as an alter-ego, it pled no facts asserting that DBMLAG or its subsidiaries were undercapitalized, did not pay dividends, employed non-functional directors in subsidiaries, siphoned funds, or failed to keep reasonable corporate records. EMS's alter-ego claim rests entirely on assertions that DBMLAG failed to observe corporate formalities and that the various subsidiaries are mere facades of the ultimate parent. To support its alter-ego claim, EMS points to DBMLAG's whole ownership of most of the subsidiary companies, shared branding between DBMLAG and the subsidiaries, and various indicia of operational control over the subsidiaries.

It is undisputed that DBMLAG owned all the shares in several subsidiaries as well as a majority interest in Schenker Libya at the time of the disputed charter party agreement. During the relevant time frame, DBMLAG was clearly the dominant, but indirect, stockholder of Schenker Libya.

EMS attempts to further support its alter-ego allegation by arguing that DBMLAG represents itself as a single entity by sharing (1) common branding or logos; (2) common trademarks; and (3) internet domain registrations. Common branding, trademarks, and shared internet domains may demonstrate a close business relationship, but do not necessarily suggest an alter-ego relationship. *See, e.g., Simeone ex rel. Simeone v. Bombardier-Rotax GmbH*, 360 F. Supp. 2d 665, 676 (E.D. Pa. 2005) (evaluating a shared logo as non-dispositive in alter-ego analysis for assessing personal jurisdiction). Alone, shared branding is insufficient to support EMS's argument.

EMS also alleges that Schenker Libya and Schenker SA shared some overlapping personnel and departments. EMS points to emails from Schenker SA employees concerning operational details related to the TOUCAN. Employees from several Schenker subsidiaries were parties to a complex August to September 2008 email chain related to surveying and preparing the TOUCAN for sailing. EMS claims that these messages, taken together, demonstrate reach-through and parental control. These messages certainly show close coordination between the Schenker SA and Schenker Libya. They also demonstrate some reliance on logistics supplied by other regional Schenker companies. Accepting EMS's allegations as true, it is plausible that Schenker SA exercised some measure of direct control over Schenker Libya.

Even if the Libyan company was an alter-ego of Schenker SA, there is no evidence that Schenker Libya was an alter-ego of DBMLAG. Multiple layers of subsidiaries separate DBMLAG

from both Schenker SA and Schenker Libya. At the heart of EMS's alter-ego theory is an allegation that DBMLAG operates as a Russian doll organization, with sham entities nested within sham entities. These purely conclusory assertions lack even the barest support. EMS has provided no basis for the court to infer an alter-ego relationship for any of the entities between Schenker SA and DBMLAG. The alleged multilevel alter-ego relationship amounts to "naked assertion[s] devoid of further factual enhancement" and is therefore insufficient to meet the minimum pleading requirements. *Ashcroft*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 557).

### C. Agency Claim

The second theory of liability EMS asserts against DBMLAG is agency. A parent may also be held liable for the actions of a subsidiary through agency theory. *Phoenix Canada Oil Co. v. Texaco, Inc.*, 842 F.2d 1466, 1477 (3d Cir. 1988). To determine whether an agency relationship exists, the court examines (1) if there is "an arrangement ... between the two corporations so that one acts on behalf of the other" and (2) whether that the arrangement relates directly to the matter alleged. *Id.* If this test is satisfied, the principal is responsible for the agreements made by the agent. Restatement (Second) of Agency § 144 (1958). The fundamental question is whether the parent and subsidiary entered into a limited agency relationship for the transaction giving rise to the claim. *Phoenix Canada*, 842 F.2d at 1478.

Here, the court must examine: (1) if there was an arrangement authorizing Schenker Libya to act on behalf of DBMLAG and (2) whether this agreement or arrangement related to the disputed charter party. Considering the pleadings most favorably for EMS, Schenker SA may have established a limited agency relationship with Schenker Libya related to the TOUCAN charter. The email exchanges between the two entities suggest that Schenker SA may have directed the Libyan personnel in the execution of the TOUCAN charter logistics. But to survive a motion to

7

dismiss, EMS must connect Schenker Libya to DBMLAG, not merely Schenker SA. EMS's agency allegations fail for the same reason as its alter-ego claim: The pleadings do not demonstrate a plausible agency relationship between DBMLAG and either Schenker SA or Schenker Libya.

### D. Partnership Claim

EMS's final argument for liability is based on partnership. A partner or member of a joint venture is vicariously liable for the actions of any other partner or co-venturer within the scope of the enterprise. *United States v. USX Corp.*, 68 F.3d 811, 826 (3d. Cir. 1995). EMS argues that DBMLAG and Schenker Libya were engaged in a partnership to execute the off-shore exploration contract. In pleading this partnership claim, EMS disputes the corporate form of Schenker Libya and points to examples where the Libyan company is characterized as a joint venture. DBMLAG represents Schenker Libya as a corporation in which Medtrans International SAS owned a 65% interest and a local, unnamed, Libyan partner owned the remaining shares. EMS claims that "Schenker Libya" was not in fact a separate corporate entity, but rather a partnership directly between DBMLAG and a local Libyan company.

EMS's challenge to the legal form of Schenker Libya includes few supporting facts. First, EMS points to a phone list of Schenker Libya personnel where several are identified as "Saraha Company," to suggest that this entity was the true joint-venture partner. While Saraha Company may be the other shareholder in Schenker Libya, the phone list does not intrinsically identify the business form of entity. Second, EMS points to an email signature and an annual report comment, both of which refer to the Libyan enterprise as a "joint venture." Third, a single Schenker Libya employee had an email signature that referred to Schenker Libya as a "J/V" with DB Schenker. (D.I. 6, Ex. 12.) EMS argues that "J/V" means "joint venture."

8

Even if the court accepts EMS's assertions that Schenker Libya was a partnership rather than a corporation, EMS has only succeeded in identifying a partnership between Sahara Company and Medtrans International SAS, not other entities in the complex hierarchy. DBMLAG is separated from the Medtrans International SAS by two other corporate entities.

Finally, EMS argues that a transportation company comprised of multiple corporate divisions and operated as an integrated system is a *de facto* partnership. *Lehigh Valley R. Co. v. Dupont*, 128 F. 840, 845 (2d Cir. 1904). In *Davis v. Alexander*, the Supreme Court held that "[w]here one railroad company *actually controls another* and operates both as a single system, the dominant company will be liable for injuries due to the negligence of the subsidiary company." *Davis v. Alexander*, 269 U.S. 114, 117 (1925) (citing *Lehigh Valley R. Co.*, 128 F. 840 (2d Cir. 1904) (emphasis added). Superficially, the circumstances of *Davis* are similar to the present case, but in substance they differ. The railroad tort cases involved questions of common carrier liability to the general public, not disputes between sophisticated parties about complex contract matters. *See Lehigh Valley*, 128 F. at 844 (involving passengers); *Davis*, 269 U.S. at 115–16 (involving damage to freight). Further, these findings of liability hinge on actual and complete control of the subordinate by the parent, which does not exist here.

The "partnership" reasoning of *Davis* was also used in early examples of piercing the corporate veil to prevent the use of the corporate form to perpetuate a fraud or other wrong. *E.g. Keystone Mining Co. v. Gray*, 120 F.2d 1, 6 (3d Cir. 1941) (citing *Davis* to support disregarding the corporate form where it was used to perpetuate a tax fraud). These cases arose along with the growth in railroads and utilize embryonic alter-ego analyses. The court finds they are equitably consistent with the mature, present alter-ego analysis discussed in B, *supra*, and do not inform the partnership inquiry.

None of EMS's arguments plausibly establish the existence of a partnership between DBMLAG and Schenker Libya. These conclusory statements alleging partnership are insufficient to meet the minimum pleading requirements. EMS has not averred facts sufficient to support any of its theories asserting that DBMLAG is liable for the arbitration judgment against Schenker Libya.

## V.    CONCLUSION

For the reasons discussed above, DBMLAG's Rule 12(b)(6) motion to dismiss for failure to state a claim is GRANTED.

Dated: January 22, 2016

UNITED STATES DISTRICT JUDGE